## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **JASON LEOPOLD et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 17-cv-2819 (APM)** |
| | ) | |
| **U.S. DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

In July 2017, the United States Senate Homeland Security & Government Affairs Committee released a report titled "State Secrets: How an Avalanche of Media Leaks is Harming National Security."  Appended to the report was a list of 152 news articles allegedly containing leaks of classified national security information.  The day after the report's release, Plaintiffs Jason Leopold, a journalist, and his then-employer, BuzzFeed News, filed Freedom of Information Act ("FOIA") requests with various offices of Defendant U.S. Department of Justice ("DOJ") seeking records related to the articles.  At issue here is the response by DOJ component National Security Division ("NSD").  NSD issued what is known as a *Glomar* response, that is, they neither confirmed nor denied the existence of records.

Both parties have moved for summary judgment.  Having carefully reviewed NSD's affidavit, the court finds it wanting.  And so, for the reasons that follow, the two cross-motions are denied without prejudice.  Because national security considerations are at the heart of the parties' dispute, the court will permit Defendant to resubmit and supplement its motion if it so chooses.

## II.    BACKGROUND

On July 7, 2017, Plaintiffs submitted identical FOIA requests through DOJ's online portal to five DOJ components, not including NSD, seeking six categories of records.   Compl., ECF No. 1 [hereinafter Compl.], ¶ 9.   Plaintiffs emailed a separate FOIA request to NSD ("NSD request") the same day seeking all but one of the same records categories.   *Id.* ¶ 27.   That request sought:

> (1) Any and all records mentioning, referring to and memorializing internal discussions about the list of 152 news articles attached to the request;
>
> (2) Any and all crimes reports drafted/prepared by DOJ NSD mentioning or referring to the list of news articles;
>
> (3) Any and all media leaks questionnaires in possession of DOJ NSD mentioning or referring to the listed news articles;
>
> (4) Any and all documents memorializing correspondence between the named reporters who authored the listed news articles and/or their editors.
>
> (5) Any and all directives, memos, and announcements to the DOJ workforce issued in 2017 mentioning or referring to leaks, insider threats, disclosure of classified information and any of the listed news articles.

Def.'s Suppl. Mot. for Summ. J., ECF No. 47 [hereinafter Def.'s Mot], Ex. B, ECF No. 47-4 [hereinafter Pls.' FOIA Request],[1] at 15–16.   The 152 news articles referenced in Part 1 of the request were those listed in the appendix to the Senate Homeland Security Committee's report on the adverse national security impacts of media leaks of classified information.[2]   As to the five DOJ components, DOJ "asserted a Glomar response" to most of the categories, and "Plaintiffs

---

[1] The court uses ECF pagination for this Exhibit.

[2] *See* STAFF OF S. COMM. ON HOMELAND SEC. & GOV'TAL AFFS., 115th CONG., *State Secrets: How an Avalanche of Media Leaks is Harming National Security*, at 14–23 (Comm. Print 2017) (available at https://www.hsgac.senate.gov/imo/media/doc/2017-07-06%20State%20Secrets%20report.pdf) (last visited Sept. 30, 2022).

administratively appealed the decisions." Compl. ¶¶ 15–20. In their cross-motion, Plaintiffs do not challenge the results of their appeals as to these five components. As to the NSD request, Plaintiffs did not administratively appeal because they claim not to have "received a final determination from NSD." *See id.* ¶ 33.

Plaintiffs filed the instant action on December 28, 2017. *Id.* at 7. Nearly four years later, DOJ filed its initial motion for summary judgment. Def.'s Mot. for Summ. J., ECF No. 39 [hereinafter Def.'s First Mot.]. As to NSD, the motion only raised an exhaustion defense. Def.'s First Mot., Def.'s Mem. of P. & A. in Supp. of Def.'s First Mot, ECF No. 39-2, at 24–26.[3] Plaintiffs moved for an order directing Defendant to amend its motion to include any other defenses, Pls.' Mot. for an Order Directing Def. to Amend its Mot. for Summ. J., ECF No. 40, which the court granted, Minute Order, Oct. 19, 2021. DOJ filed its supplemental motion for summary judgment only on behalf of NSD on January 7, 2022. Def.'s Mot. Therein, NSD asserted a *Glomar* response as to Parts 1, 3, and 4 of the request. Def.'s Mot., Decl. of Patrick Findlay, ECF No. 47-4 [hereinafter Findlay Decl.], ¶¶ 9–16, 18–19. As to Parts 2 and 5, NSD determined it was reasonable not to search for records. *Id.* ¶¶ 17, 20. Plaintiffs opposed and cross-moved, Pls.' Cross-Mot. for Summ. J., ECF No. 49 [hereinafter Pls.' Cross-Mot.], and the motions are now ripe for consideration.

## III.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine issue of material fact is one that "might

---

[3] Defendant's initial summary judgment motion also was brought on behalf of another DOJ component, the Office of Information Policy, but the parties resolved that dispute before the supplemental briefing.

affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323.  When determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *see also Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment.").  A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983).  The court may enter summary judgment based solely upon information provided in affidavits or declarations when those affidavits or declarations describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exception, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  "An agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Media Rsch.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal alteration omitted)).

Courts give agency declarations "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted).  Once

the court determines that an agency has released all non-exempt material, it has no further judicial

function to perform under FOIA, and the FOIA claim is moot.  *See Perry v. Block*, 684 F.2d 121,

125 (D.C. Cir. 1982).

## IV.   DISCUSSION

### A.   Administrative Exhaustion

FOIA requires reviewing agencies to "determine within 20 days . . . after the receipt of any

[FOIA] request whether to comply with such request" and notify the requester "in the case of an

adverse determination" of their right to administratively appeal to the agency.   5 U.S.C.

§ 552(a)(6)(A)(i)(III)(aa).  This is known as FOIA's administrative exhaustion requirement.

While exhaustion is not jurisdictional, "FOIA's administrative scheme favors treating

[it] . . . as a bar to judicial review."  *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004) (internal

quotation marks omitted).  The D.C. Circuit has consistently required requesters to exhaust their

administrative remedies in FOIA cases before seeking relief in federal court.  *Oglesby v. U.S. Dep't

of Army*, 920 F.2d 57, 61–62 (D.C. Cir. 1990) (citing cases).  Exhaustion is required "so that [an]

agency may function efficiently and so that it may have an opportunity to correct its own errors,

to afford the parties and the courts the benefit of its experience and expertise, and to compile a

record which is adequate for judicial review."  *Hines v. United States*, 736 F. Supp. 2d 51, 53

(D.D.C. 2010).

NSD argues it "provided Plaintiffs with a final determination letter" "on August 9, 2017"

and that Plaintiffs failed thereafter to file an administrative appeal before they filed suit on

December 28, 2017.  Def.'s Mot., Def.'s Mem. of P. & A. in Supp. of Def.'s Mot, ECF No. 47-2

[hereinafter Def.'s Mem.], at 5 (first citing Def.'s Mot., Ex. D, ECF No. 47-3, and then citing

Def.'s Mot, Decl. of Kevin Tiernan, ECF No. 47-3, ¶ 7).  NSD therefore contends that Plaintiffs failed to exhaust their administrative remedies before filing suit.

Plaintiffs offer multiple counterarguments.  First, they cast doubt that the unsigned final determination letter was ever actually sent.  Pls.' Cross-Mot., Pls.' Mem. of P. & A. in Opp'n to Def.'s Mot. and in Supp. of Pls.' Cross-Mot, ECF No. 49 [hereinafter Pls.' Mem.], at 1.  Second, Plaintiffs argue that "it is undisputed that [Leopold] never received it."  *Id.* (citing Pls.' Cross-Mot., Decl. of Jason Leopold, ECF No. 49-2 [hereinafter Leopold Decl.] ¶¶ 4–5).  Third, Plaintiffs assert that even if the court were to find NSD sent its final determination letter on August 9, 2017, Plaintiffs' request was still constructively exhausted because that date fell after the 20-day deadline.  *Id.* at 1–2 (citing 5 U.S.C. § 552(a)(6)(C)(i) ("Any person making a request to any agency for records . . . shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph.")).  And finally, if the court rejects its constructive exhaustion argument, Plaintiffs ask the court to excuse their failure to exhaust.  *Id.* at 3.  Because the court finds that Plaintiffs did not receive the final determination letter, the court does not consider Plaintiffs' other contentions.

NSD does not genuinely dispute that a plaintiff's obligation to exhaust only arises after receipt of an agency's final determination letter.  Def.'s Mem. of P. & A. in Opp'n to Pls.' Cross-Mot. & Reply in Supp. of Def.'s Mot., ECF No. 50 [hereinafter Def.'s Reply], at 2–7.  And this is for sound reason.  As the D.C. Circuit explained in *Oglesby*, "[t]he purpose of the [20]-day limit for an agency response is to allow a FOIA requester, who has not yet *received* a response from the agency, to seek a court order compelling the release of the requested documents."  920 F.2d at 64 (emphasis added).  Similarly, courts in this District have declined to grant summary judgment against a requester on exhaustion grounds, where a requester submits a sworn statement attesting

to non-receipt of the agency response.  *Kleinert v. Bureau of Land Mgmt.*, 132 F. Supp. 3d 79, 87

n.2 (D.D.C. 2015) ("The agency presumably recognizes that because Kleinert did not *receive* the

agency's response within the relevant statutory period and before filing this suit (even if BLM did

*send* it), Kleinert constructively exhausted his administrative remedies."); *Bloomgarden v. Dep't

of Just.*, 10 F. Supp. 3d 146, 151–52 (D.D.C. 2014);  *Pinson v. Dep't of Just.*, 177 F. Supp. 3d 56,

78 (D.D.C. 2016).

　　　　Rather than challenge the legal premise, NSD attacks Plaintiffs' assertion of non-receipt.

First, NSD argues that Plaintiffs waived any argument of non-receipt through a single line in a

Joint Status Report filed by the parties.  Def.'s Reply at 4 (citing Joint Status Report, ECF No. 6,

at 1 ("Defendant issued a final response to [Plaintiffs' FOIA] request on August 9, 2017.")).

Additionally, NSD claims that, measured against the Joint Status Report, Leopold's declaration is

akin to an improper "sham affidavit" used to "creat[e] an issue of material fact by contradicting

prior sworn testimony."  Def.'s Reply at 5 (quoting *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030

(D.C. Cir. 2007) (internal quotation marks omitted)).  And finally, NSD states that Leopold's

declaration "runs afoul of the presumption of regularity that attaches to government acts and

documents."  Def.'s Reply at 5–6 (citing *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117

(D.C. Cir. 2007)).

　　　　The court is unconvinced.  First, the Joint Status Report does not concede receipt or waive

the defense of non-receipt.  Plaintiffs had already stated in both the Complaint and in email

correspondence between the parties that Leopold had not received a final determination from NSD.

Pls.' Reply in Supp. of Pls.' Cross-Mot., ECF No. 52 [hereinafter Pls.' Reply], at 3–5 (first citing

Compl. ¶ 33 ("Although 20 business days have elapsed since July 7, 2017, Plaintiffs have not

received a final determination from NSD as to the request.") and then citing Pls.' Reply, Ex. 1,

ECF No. 52-1 (email from Plaintiffs' counsel stating "We will also be litigating the NSD request which we believe was properly exhausted because Plaintiff never received the letter")). The Joint Status Report did not negate these representations. Further, given the absence of any concession as to receipt, the "sham affidavit" rule has no application. *See Galvin*, 488 F.3d at 1030 ("[T]he so-called 'sham affidavit rule[]' . . . precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony." (internal quotation marks omitted)). Finally, accepting Leopold's attestation of non-receipt is not at odds with the presumption of regularity. The court has no reason to doubt that DOJ issued a final determination letter; the sole question is whether Leopold received it. And he says he did not. Leopold represents, under oath, that he "never received [NSD's Final Determination Letter] or any similar letter" nor did he "receive[] any final response" as to that FOIA request. Leopold Decl. ¶¶ 4–5. Leopold goes on to state that he "would have known if any correspondence regarding" the NSD FOIA request "had been delivered to [his] address" because he "had been specifically watching [his] mail for a response" as he "considered this FOIA request to be very important." *Id.* ¶ 6. Defendant offers nothing that causes the court to question Leopold's veracity. "Therefore, because it cannot be said that the evidence is so one-sided that one party must prevail as a matter of law, a disputed issue of material fact exists and the Court will not grant [NSD's] motion for summary judgment on exhaustion grounds." *Bloomgarden*, 10 F. Supp. 3d at 152 (internal quotation marks and alteration omitted).

### B.   Adequacy of Defendant's Part 1 Search

Plaintiffs contend that "NSD misconstrued Part 1 of [their] FOIA request." Pls.' Mem. at 3. Part 1 requested "[a]ny and all records mentioning, referring to and memorializing internal

discussions about the list of 152 news articles attached to the request."  Compl. ¶ 27(1).  Plaintiffs

complain that rather than adhering to their "broad 'any and all' request," NSD unduly cabined it

to "the context of an Intelligence Community (IC) element having referred to NSD an allegation

of an authorized disclosure of classified information to the news media," what are known as

"crimes reports."  Pls.' Mem. at 3, 6 (citing Findlay Decl. ¶ 11).  But NSD's declarant, NSD

general counsel Patrick N. Findlay, says otherwise.  Findlay writes that "NSD FOIA determined

that any [responsive] records . . . would *only* exist in" that context.  Findlay Decl. ¶ 11 (emphasis

added).  In other words, Findlay says that any responsive records to Part 1 would be found, if at

all, only in the context of an intelligence community referral contained in a crimes report.  The

court therefore agrees with Defendant that NSD did not misconstrue Plaintiffs' request.  Def.'s

Reply at 10–11.

### C.      Procedural Compliance with *Glomar* for Parts 1, 3, and 4

NSD asserted a *Glomar* response neither confirming nor denying the existence of records

to Parts 1, 3, and 4 of Plaintiffs' request.  Plaintiffs assert that NSD's *Glomar* response falls short

because it is procedurally insufficient.  Pls.' Mem. at 4–6.  This argument requires some initial

unpacking.

The D.C. Circuit has stated that, in evaluating a *Glomar* response, "courts apply the general

exemption review standards established in non-*Glomar* cases."  *Wolf v. CIA*, 473 F.3d 370, 374

(D.C. Cir. 2007).  Here, NSD relies on both Exemptions 1 and 7(A).  Def.'s Mem. at 7; Findlay

Decl. ¶¶ 13, 15.  Plaintiffs only raise a procedural challenge with respect to Exemption 1.

Under the text of FOIA, Exemption 1 carves out from disclosure records that are both

"(A) specifically authorized under criteria established by an Executive order to be kept secret in

the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to

such Executive order." 5 U.S.C. § 552(b)(1).  The Executive Order in question here is Executive

Order 13526.  Def.'s Mem. at 7 (citing Classified National Security Information, 75 Fed. Reg. 707

(Dec. 29, 2009)).  The Order authorizes classification "only if all of the following" four criteria

are satisfied:

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Classified National Security Information, 75 Fed. Reg. at 707 § 1.1(a); *see also Lindsey v. FBI*

(*Lindsey II*), 490 F. Supp. 3d 1, 11 (D.D.C. 2020) (setting out the same procedural requirements);

*ACLU v. CIA* (*ACLU Interrogations*), 892 F. Supp. 2d 234, 245 (D.D.C. 2012) (same); *Mobley v.*

*CIA*, 924 F. Supp. 2d 24, 47–48 (D.D.C. 2013) (same).  Plaintiffs dispute NSD's compliance with

the last two of these requirements, Sections 1.1(a)(3) and (4).  Pls.' Reply at 8.

> 1.   *Section 1.1(a)(3)*

Section 1.1(a)(3) of Executive Order 13526 directs a classifier to Section 1.4's

Classification Categories.  In evaluating a *Glomar* response based on Exemption 1, courts in this

Circuit have considered whether the agency has identified one of the eight Classification

Categories contained in Section 1.4.[4]  In *Wolf*, the D.C. Circuit upheld the CIA's Exemption 1-

---

[4] The categories include:

based *Glomar* response predicated on a predecessor Executive Order.[5]  473 F.3d at 375–76.  The CIA's affidavit in *Wolf* asserted the information concerned "an intelligence source or method" and "outline[d] the potential harm to foreign relations that would reasonably result from" a non-*Glomar* response.  473 F.3d at 376.  "[I]ntelligence sources or methods" and "foreign relations" were two of the seven classification categories in the prior Executive Order.  Classified National Security Information, 60 Fed. Reg. at 19,827 § 1.5(c), (d).  And in *Lindsey II*, the district court granted summary judgment in favor of the FBI based on an affiant's statement that he had "determined that the existence or nonexistence of requested records is a properly classified fact that concerns sections 1.4(c) ('intelligence sources or methods') and 1.4(d) ('foreign relations or foreign activities of the United States')."  *Id.* at 12, 14.

NSD's affidavit falls short in comparison to those in *Wolf* and *Lindsey II*.  In it, Findlay states that "[c]lassified information in NSD records is frequently, though not exclusively, classified under section 1.4(c) of Executive Order 13526 which covers intelligence activities, sources, and methods."  Findlay Decl. ¶ 10.  While Findlay cites to one of the Classification Categories, it is not for the responsive records but for "[c]lassified information in NSD records" *in general*.  *Id.*

_____

(a)  military plans, weapons systems, or operations;
(b) foreign government information;
(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology;
(d) foreign relations or foreign activities of the United States, including confidential sources;
(e) scientific, technological, or economic matters relating to the national security;
(f) United States Government programs for safeguarding nuclear materials or facilities;
(g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or
(h) the development, production, or use of weapons of mass destruction.

Classified National Security Information, 75 Fed. Reg. at 709 § 1.4.
[5] This predecessor Executive Order's classification requirements largely mirrored the 2009 update at issue here.  The prior Executive Order's Section 1.2(a)(3), like Executive Order 13526's Section 1.1(a)(3), mandated that classified "information falls within one or more of" specifically enumerated Classification Categories listed elsewhere in the Order.  Classified National Security Information, 60 Fed. Reg. 19,825, 19,826 § 1.2(a)(3) (Apr. 17, 1995).

Furthermore, Findlay undercuts even that minimal offering by later writing that "the particular reason a piece of information that was provided to a reporter might have been classified could span the entirety of the reasons information is classified under Executive Order 13526." *Id.* ¶ 12.  This language does speak more directly to the requested records, but it is premised on equivocal language that "the particular reason . . . *could* span" the full roster of reasons available under the Executive Order.  *Id.* (emphasis added).  Thus, Findlay fails to affirmatively state that the crimes reports "fall[] within one or more of the categories of information listed in section 1.4."  Classified National Security Information, 75 Fed. Reg. at 707 § 1.1(a)(3).

Defendant argues that Plaintiffs misread the Findlay Declaration.  Def.'s Reply at 12–14.  First, the fact of the existence of any crimes reports fitting Plaintiffs' request necessitates that "an agency other than the Department . . . determine[] that classified information was revealed in a news article."  Def.'s Reply at 12 (quoting Findlay Decl. ¶ 12).  And "NSD is bound by the classification determination of the other agency."  Def.'s Reply at 12 (citing Derivative Classification, 32 C.F.R. § 2001.22 (2021) and Classified National Security Information, 75 Fed. Reg. at 712–14 §§ 2.1, 3.1).  This is dispositive of Plaintiffs' argument, NSD presses, because FOIA Exemption 1 requires nothing more than that "the *most recent classification* of a requested document be in" procedural compliance with the Executive Order in question.  Def.'s Reply at 12 (quoting *Allen v. CIA*, 636 F.2d 1287, 1291 (D.C. Cir. 1980), *overruled on other grounds by Founding Church of Scientology v. Smith*, 721 F.2d 828 (D.C. Cir. 1983)).  At bottom, NSD says that the proper Classification Category for a crimes report is fixed by the referring agency, not NSD, so NSD must accept whatever classification is ascribed to a report.

But even if that is true it does not resolve the fundamental problem with the Findlay Declaration: it does not identify any Section 1.4 category that is particular to the crimes reports, as opposed to NSD records generally.  This lack of specificity renders the declaration inadequate.

### 2.      *Section 1.1(a)(4)*

Section 1.1(a)(4) requires both that "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and that "the original classification authority is able to identify or describe the damage."  Classified National Security Information, 75 Fed. Reg. at 707 § 1.1(a)(4).  NSD has satisfied the first inquiry but not the second.

Because "courts lack the expertise necessary to second-guess . . . agency opinions in the typical national security FOIA case," the D.C. Circuit has directed district courts to "accord substantial weight to an agency's affidavit."  *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) (internal quotation marks omitted).  Courts must be mindful "that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm."  *Wolf*, 473 F.3d at 374.

Findlay states that the fact of NSD possession of specific, IC-referred crimes reports "could provide hostile foreign powers operationally valuable information about United States intelligence activities" based on whatever classified information was in the articles.  Findlay Decl. ¶ 12.  Under the Circuit's deferential standard, this is enough to satisfy the requirement than an original classification authority deem unauthorized disclosure reasonably harmful to national security. Even Plaintiffs concede as much.  Pls.' Reply at 9.  Yet nowhere in the relevant part of Findlay's

Declaration does he take the next required step and "identify or describe the damage."  *See* Findlay Decl. ¶¶ 9–16.

Prior decisions from this Circuit make clear the level of detail expected of that description. The CIA's affidavit in *Wolf* detailed how confirming or denying the existence of records requested about a former Colombian politician might "thwart[] or ma[k]e more difficult" the agency's efforts to use "foreign nationals as sources . . . to carry out its intelligence-gathering duties," thereby "reducing the CIA's effectiveness." 473 F.3d at 372, 376.  Confidentiality is paramount to the CIA's efforts, the agency explained, because "official confirmation of a source's cooperation with the Agency could cause the target government to take retaliatory action against that person, or, if he is no longer alive, against his surviving family and friends." *Id.* at 376 (internal alterations omitted).  Failure to maintain confidentiality would not only "seriously damage this nation's credibility with all other current intelligence sources"; it would also "undermine CIA's ability to attract potential intelligence sources in the future." *Id.*; *see also Lindsey II*, 490 F. Supp. 3d at 12–13 (providing a detailed explanation of the potential harm that would result to both intelligence sources and methods and foreign relations from revealing the existence of responsive records); *ACLU Interrogations*, 892 F. Supp. 2d at 246–47 (in a non-*Glomar* case, affirming the agency's Exemption 1 withholding in response to a request for records regarding "unauthorized interrogation techniques" where the agency's declarant explained that disclosure of the requested records "would reveal U.S. intelligence needs, priorities, and capabilities to" adversaries who would then "be put on notice that their activities and information had been targeted by the CIA; future intelligence collection activities would be made more difficult; and, as a result, the conduct of such operations would become even more dangerous").

Here, Findlay does not go beyond saying that adversaries may gain "operationally valuable information."  Findlay Decl. ¶ 12.  It is not for the court to surmise what harm might befall the United States if such information ended up in the wrong hands; the burden is NSD's.  5 U.S.C. § 552(a)(4)(B) ("[T]he burden is on the agency to sustain its action.").  The court recognizes that, in this unique case, making the requisite harm assessment is made more challenging given the likely diverse national security interests implicated by the 152 news articles at issue and the different intelligence-community components that might have prepared a crimes report.  *See* Pls.' FOIA Request at 19–28.  It may be that NSD needs "some kind of system for soliciting the views of the original classifier."  *McGehee*, 697 F.2d at 1110 n.71.  In any event, NSD's evaluation of potential damage requires more than simply saying that disclosure could lead adversaries to obtain "operationally valuable information."  It has not met its burden under Section 1.1(a)(4) of the Executive Order.

### D.      Justification for *Glomar* Response as to Parts 1, 3, and 4

Plaintiffs also contest whether NSD has sufficiently justified its *Glomar* response on the merits to allow it to refuse to confirm or deny the existence of records under either Exemptions 1 or 7(A).  Pls.' Mem. at 6–9, 10–11.  Plaintiffs mount this challenge as to Parts 1, 3, and 4 of their FOIA request.  *Id.* at 6–9.

"An agency may issue a *Glomar* response when ' . . . answer[ing] the FOIA inquiry would cause harm cognizable under' an applicable statutory exemption."  *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting *Wolf*, 473 F.3d at 374).  "The agency must demonstrate that acknowledging the mere existence of responsive records would disclose exempt information."  *Id.*  An agency affidavit that supports the *Glomar* response must justify the invocation based on "general exemption review standards established in non-*Glomar* cases."  *Wolf*,

473 F.3d at 374. Ultimately, the question for the court is whether the agency's justification for asserting the exemption is "logical or plausible." *Id.* at 374–75 (internal quotation marks omitted). In cases such as this one, where national security concerns are implicated, the courts "must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.* at 374 (internal quotation marks omitted).

The cases cited relating to Executive Order Section 1.1(a)(4), *supra*, illustrate what it means for the justification to be "logical or plausible" for purposes of an Exemption 1 *Glomar* response. In *Wolf*, the Circuit found it "plausible that either confirming or denying an Agency interest in a foreign national reasonably could damage sources and methods by revealing CIA priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures against the CIA and thus wasting Agency resources." 473 F.3d at 376–77. It similarly found it logical that "the need to assure confidentiality to a foreign source includes neither confirming nor denying the existence of records even decades after the death of the foreign national." *Id.* at 377. *Lindsey II* provided detailed examples tying the *Glomar* response's invocation of Exemption 1 to real-world harm to both intelligence sources and foreign relations. 490 F. Supp. 3d. at 12–13. As in *Wolf*, the court found it was "plausible" that confirmation or denial of "the existence, or non-existence, of any other records responsive to the [p]laintiff's request, which regard[ed] a foreign national," might foreseeably "damage intelligence sources and methods" through the exposure of "investigative interests and priorities, which" foreign adversaries might use in their counterintelligence efforts. *Id.* at 14; *see also Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (same where CIA's invocation of *Glomar* kept secret whether Chilean requester was ever a CIA asset). And in *ACLU Interrogations*, the court credited the agency's argument "that disclosure of information about" the "unauthorized interrogation

techniques" "would reveal details . . . that could assist foreign terrorist organizations and foreign governments, and thereby damage national security."  892 F. Supp. 2d at 246–47; *see also ACLU v. CIA* (*ACLU Drones*), 710 F.3d 422, 428–30 (D.C. Cir. 2013) (rejecting CIA's "sweeping *Glomar* response" in response to request for records related to drone strikes as unjustified where President and his counterterrorism advisor had publicly acknowledged United States use of drones because it was "neither logical nor plausible" that CIA had no "intelligence interest" in them).

Exemption 7 *Glomar* cases are to the same effect.  For example, in *Montgomery v. IRS*, the Circuit upheld the agency's *Glomar* response under Exemption 7(D) where it prevented requesters from confirming whether a whistleblower contributed to the underlying IRS investigation into their tax-fraud scheme.  40 F. 4th 702, 707, 711–12 (D.C. Cir. 2022).  And in *Weddington v. U.S. Department of Justice*, the court permitted NSD's Exemption 7(A) *Glomar* response where a requester sought records relating to a potential counterterrorism investigation that may or may not have been undertaken by the DOJ component.  581 F. Supp. 3d 218, 232–35 (D.D.C. 2022).

In evaluating this caselaw, a consistent theme emerges: "[A] *Glomar* response[] [is] appropriate where an acknowledgment that records exist would provide the requester with the very information the exemption is designed to protect."  *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 834 n.9 (D.C. Cir. 2001) (internal quotation marks omitted).  Or, put differently, the response is typically credited where the "*Glomar* fact" *is* the requested information.  *See Mobley*, 924 F. Supp. 2d at 47 ("The parties refer to the fact of the existence or nonexistence of responsive records as the *Glomar* fact." (internal quotation marks omitted)).

In this case, NSD's justification for invoking *Glomar* does not measure up for either Exemption 1 or 7(A).  As part of its reliance on Exemption 1, NSD argues that "[c]onfirming the existence [of] '*any* crimes reports related to the cited articles' is a confirmation of the existence of

*particular* crimes reports." Def.'s Reply at 9 n.4 (quoting Findlay Decl. ¶ 12). And NSD similarly justifies its reliance on Exemption 7(A) by explaining that "acknowledg[ing] the existence of a related crimes report would necessarily confirm the existence or non-existence of a[] related investigation." *Id.* at 15 (citing Findlay Decl. ¶¶ 13, 15). These abbreviated justifications do not "plausibly" or "logically" explain how the mere acknowledgement of the existence of crimes reports in response to this particular FOIA request would disclose the existence of leaked classified intelligence (Exemption 1) or an ongoing law enforcement investigation (Exemption 7(A)).

Unlike *Wolf*, *Lindsey II*, or any of the other cited cases, this case does not involve an information request about a specific individual or subject matter. Rather, Plaintiffs request crimes reports, media leak questionnaires, and correspondence relating to *152 articles* on a variety of subject matters spanning the course of *16 years*. *See* Pls.' FOIA Request at 19–28. It is not clear to the court how divulging the existence (and nothing more) of *a* crimes report, for instance, would tell the public anything about whether there was any classified information in one of the 152 articles or that there is an ongoing leak investigation regarding any particular article. The agency has not explained how a non-*Glomar* response would divulge any protected information concerning, for example, the tardy disclosure of evidence related to the prosecution of convicted Oklahoma City bomber Timothy McVeigh*, see* Pls.' FOIA Request at 27; President Trump's firing of FBI Director Jim Comey, *see id.* at 19–21 (cataloging at least a dozen related articles from May 2017); President Trump's contemplated relaxation of "rules governing drone strikes," *id.* at 23; or another topic entirely. Even with the substantial deference the court must afford an agency in the national security setting, NSD has not persuaded the court that its *Glomar* response in this case is plausible or logical.

Furthermore, Exemption 7(A) allows an agency to withhold law enforcement records and information only if the release of such information "relates to a concrete *prospective* law enforcement proceeding." *Carson v. U.S. Dep't of Just.*, 631 F.2d 1008, 1018 (D.C. Cir. 1980) (emphasis added) (internal quotation marks omitted). But here, the key law NSD cites as a legal predicate for opening any of these investigations, 18 U.S.C. § 798, has a five-year statute of limitations. Findlay Decl. ¶ 13; *see* 18 U.S.C. §§ 798, 3282(a). Therefore, it may be that, as a matter of law, there can be no "prospective" law enforcement proceeding with respect to many of the articles, particularly the 27 cited from the first year of each of the Bush and Obama administrations. *See* Pls.' FOIA Request at 26–28. Presumably, any prosecution of a leaker relating to those articles would be time barred. It therefore cannot be true that acknowledging the existence of *any* crimes report would reveal an ongoing law enforcement investigation as to those articles. The court therefore remains unconvinced by the justification of NSD's *Glomar* response even as to Exemption 7(A).

### E.    Adequacy of Search as to Part 5

The final dispute concerns NSD's response to Part 5 of Plaintiffs' request, which seeks "directives, memos, [and] announcements" sent to the entirety of DOJ in 2017 about the 152 articles and "leaks, insider threats, [or] disclosure of classified information." *Id.* at 16. NSD argues it "reasonably determined that it would not have records responsive" because NSD is not the DOJ component responsible for issuing such memos. Def.'s Mem. at 13.

"[W]hen an agency receives a FOIA request for 'agency records' in its possession, it must take responsibility for processing the request. It cannot simply refuse to act on the ground that the documents originated elsewhere." *McGehee*, 697 F.2d at 1110. But that is precisely what NSD did here. Findlay does not explain why NSD would not have any responsive records. Rather, he

simply states that "as just one component, [NSD] does not issue directives, memos, or announcements to the entire DOJ workforce." Findlay Decl. ¶ 20. But, of course, Part 5 does not ask solely for records that NSD "issue[d]" to the "entire DOJ workforce." Fairly construed, it also sought responsive all-workforce documents that NSD would have *received*. *See Nation Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) ("Although a requester must reasonably describe the records sought, an agency also has a duty to construe a FOIA request liberally." (cleaned up)). Findlay makes clear that NSD did not conduct a search for any such records.

NSD's sole proffered justification for directing Plaintiffs elsewhere is a departmental regulation that informs requesters that DOJ "has a decentralized system for responding to FOIA requests . . . . To make a request for records of the Department, a requester should write directly to the FOIA office of the component that maintains the records being sought." 28 C.F.R. § 16.3(a)(1) (2021); *see also* Def.'s Mem. at 11–12. But that regulation is simply instructional. It does not require a person to make a request only to the DOJ component that originated a responsive record. The following sentence of the regulation makes its instructional nature clear: "A request will receive the quickest possible response if it is addressed to the FOIA office of the component that maintains the records sought." 28 C.F.R. § 16.3(a)(1). The regulation does not relieve NSD from the obligation to search for records responsive to Part 5 of Plaintiffs' FOIA request.

V.    **CONCLUSION**

Although the court has concluded that NSD has not met its burden with respect to its *Glomar* responses as to Parts 1, 3, and 4 of Plaintiffs' request, the court declines at this time to enter judgment in favor of Plaintiffs. Because NSD asserts both national security and law

enforcement justifications for its *Glomar* invocations, the court will allow NSD another opportunity to defend its *Glomar* responses and renew its motion for summary judgment. If it chooses not to, NSD must then conduct a search and submit a *Vaughn* index explaining the grounds for any withholdings. Additionally, NSD must conduct a search for records responsive to Part 5 of Plaintiffs' request. Accordingly, the parties' cross-motions for summary judgment are denied.

The parties shall submit a Joint Status Report by October 14, 2022, which proposes a schedule for further proceedings.

Dated: September 30, 2022

Amit P. Mehta
United States District Judge